

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-14-00471-CV

**IN THE INTEREST OF J.M.H.**, a Child

From the 150th Judicial District Court, Bexar County, Texas
Trial Court No. 2013-PA-02505
Honorable Peter A. Sakai, Judge Presiding[1]

Opinion by:    Marialyn Barnard, Justice

Sitting:       Karen Angelini, Justice
               Marialyn Barnard, Justice
               Patricia O. Alvarez, Justice

Delivered and Filed:  November 26, 2014

AFFIRMED

Appellee P.A.H. ("Mother") sought to terminate the parental rights of her child's presumed

father, J.L.H. ("Father").  After a hearing, the trial court granted Mother's requested relief.  In the

order of termination, the trial court determined Father had violated sections (F), (H), and (Q) of

section 161.001(1) of the Texas Family Code.[1]  *See* TEX. FAM. CODE ANN. § 161.001(1)(F), (H),

(Q) (West 2014).  The trial court further determined termination would be in the best interests of

the child pursuant to section 161.001(2).  *Id.* § 161.001(2).  On appeal, Father does not challenge

the trial court's findings relative to the grounds for termination, but contends the evidence is legally

---

[1] The Honorable Janet Littlejohn is the presiding judge of the 150th Judicial District Court, Bexar County, Texas.
However, the termination order in this matter was signed by the Honorable Peter Sakai, presiding judge of the 225th
Judicial District Court, Bexar County, Texas.

and factually insufficient to support the trial court's determination that termination was in the child's best interests. We affirm the trial court's judgment.

### *Standard of Review*

Pursuant to the Texas Family Code, a court may terminate parental rights only upon proof by clear and convincing evidence that the parent has committed an act prohibited by section 161.001(1) of the Texas Family Code ("the Family Code"), and that termination is in the best interest of the child. *Id.* § 161.001(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009); *In re E.A.G.*, 373 S.W.3d 129, 140 (Tex. App.—San Antonio 2012, pet. denied). The Family Code defines clear and convincing evidence as "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008); *see J.O.A.*, 283 S.W.3d at 344; *E.A.G.*, 373 S.W.3d at 140. Courts use this heightened standard because when a parent's rights to his child are terminated, the result is permanent and results in unalterable changes for both parent and child, which implicate due process. *E.A.G.*, 373 S.W.3d at 140. Thus, in termination cases, the reviewing court must determine whether the evidence is such that a fact finder could reasonably form a firm belief or conviction that the grounds for termination were proven and that the termination was in the best interests of the child. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

In reviewing legal sufficiency of the evidence in termination cases, we view the evidence in the light most favorable to the trial court's finding and judgment. *Id.* Any disputed facts are resolved in favor of the lower court's finding, if a reasonable fact finder could have so resolved them. *Id.* All evidence that a reasonable fact finder could have disbelieved is disregarded; however, we must consider undisputed evidence even if it is contrary to the trial court's finding. *Id.* In sum, we consider evidence favorable to termination if a reasonable fact finder could, and we disregard contrary evidence unless a reasonable fact finder could not. *Id.*

However, we may not weigh a witness's credibility, which depends on appearance and demeanor, as such issues are within the province of the fact finder. *Id.* at 573. Even when such issues are found in the appellate record, we must defer to the trier of fact's reasonable determinations. *Id.*

In a factual sufficiency review, we give due deference to the factfinder's determinations and must abstain from substituting our judgment for that of the trier of fact. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction [in the truth of its finding], then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)).

### *Law on Best Interest*

There exists a strong presumption that maintaining the parent-child relationship is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). In 1976, the supreme court set forth factors for courts to consider when making and reviewing a best interest determination: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive and the court need not find evidence of each and every factor before it may terminate. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex.

2002). That is, an absence of evidence as to some of the *Holley* factors does not preclude a trier of fact from reasonably forming a strong conviction or belief that termination is in a child's best interest. *Id.* In fact, evidence of a single factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* Moreover, although proof of acts or omissions under section 161.001(1) of the Texas Family Code does not relieve the Texas Department of Family and Protective Services ("the Department") from proving the best interests of the child, the same evidence may be probative of both issues. *Id.* at 28 (citing *Holley*, 544 S.W.2d at 370; *Wiley v. Spratlan*, 543 S.W.2d 349, 351 (Tex. 1976)).

### *The Evidence*

Mother and Father never married, but lived together for less than a year before she learned she was pregnant with J.M.H. in March 2007. Mother testified that as soon as she found out she was pregnant, she called Father, who was "shocked and surprised." Mother stated she wanted to work things out with Father "for the baby[,] but he wasn't interested in that." Mother claimed that within a month or so of learning about the pregnancy, Father abandoned her, making it clear "he didn't want to help or do anything towards helping me provide for [the baby]." She testified they never lived together as a couple after she announced she was pregnant. Despite this, Mother said she tried to reestablish a relationship with Father "so that he would be there for our daughter." However, despite her requests, Father provided neither financial support during the pregnancy nor did he attend doctor's visits with Mother. Mother's medical records contain entries showing concern over Father's absence during the pregnancy.

Father contradicted the testimony, stating they lived together during the pregnancy and thereafter until Mother left for England, and that he attended prenatal visits with Mother "all the time," attending three ultrasounds. Moreover, he asserted he provided Mother with financial support during the pregnancy. Mother denied all of Father's claims.

Mother strongly denied Father's claims of involvement during the pregnancy, testifying his participation consisted of showing up at the hospital after the birth to sign the birth certificate. After he did, Mother stated her nurse "had to kick him out because he was trying to fight and argue with me." Mother said Father was not concerned about seeing or holding the baby. Mother said that when she left the hospital with the baby, she left alone. Mother and J.M.H. returned to Mother's apartment alone. Father disputed this, stating he was present during the birth, recorded it, and cut the umbilical cord — he claimed Mother must still have the video.

Mother claimed Father continued to refuse to provide any financial support after the birth and when asked, would reply, "I don't have the money." This is documented in Mother's medical records, which described the lack of financial support as family maltreatment. However, on cross-examination, some of Mother's bank statements from 2007 through 2009 were admitted into evidence. The statements showed various transfers — totaling more than $2,000.00 — from Father's account to Mother's account. Mother admitted she received the money. Father specifically testified that while they lived together, they took turns each month paying the bills. Father provided some evidence of payment of a cable television bill and a department store bill. He also claimed to have purchased baby formula, a car seat, a baby stroller, and a crib.

Mother testified Father refused to see the baby after the birth, despite Mother "literally beg[ging] him to spend . . . time with her . . . [but] he was always too busy." Mother admitted there were a few occasions when she was able to convince Father to visit and have pictures taken, and when the child was four-months-old, Father agreed to take a family photo. Father asserted he had an entire box of pictures of J.H.M., but claimed they must have been lost during a move. However, Mother testified that when he visited, Father "acted like he did not have time for [J.M.H.]," spending the time attempting to restore the relationship with Mother or asking to borrow money. According to Mother, she had to place J.M.H. in "full-time day care because [Father]

wouldn't watch her while I was at work." Mother said Father had "plenty of opportunities" early in J.M.H.'s life to spend time with her, but he did not. Mother stated Father's claim that he was "an active parent all the way through my incarceration up until 2009" was untrue. Father, however, testified that as a couple they had a party for J.M.H. on her first birthday, and he paid for the party, which included a clubhouse rental. He stated his mother, sister, and aunts were present.

In 2009, Mother, who was a member of the United Stated military, was ordered to England. Father "signed a note" stating he had no objection to Mother taking J.M.H. to England. Father claimed this is when the couple separated. Father explained that he planned to go with Mother to England and had his passport. He testified they even moved onto the military base together before leaving. However, it is undisputed Father did not go to England — there was no testimony as to why he did not go.

Mother stayed in England until 2012, when she was medically discharged and moved to San Antonio. According to Mother, while they were in England, Father never sent birthday cards, Christmas cards, gifts, or money. Father testified he called and spoke to them every day until he was incarcerated. Mother testified she was aware that Father claimed he provided financial support while she and J.M.H. were in England. However, Mother stated the money he sent was for repayment of a loan. She testified that before she left the United States, she helped Father pay his bills and loaned him money. According to Mother, she told Father that if he was unwilling to help provide financial support for J.M.H., he needed to "at least give me the money you owe me so that I can." Father denied this, testifying the money was for J.M.H.

At the time of the termination hearing, J.M.H. was six-years-old. Mother testified that for approximately five of the child's six years, Father was incarcerated in state or federal facilities for drug-related or violent crimes, some involving a deadly weapon. More specifically, Mother testified that in 2009, Father was convicted of the offense of assault on a police officer involving

a deadly weapon. Mother stated Father told her he fired a weapon at a police officer. Father claimed the offense was felon in possession of a firearm, but it is undisputed that Father was sentenced to four years in a Virginia prison and was released in 2012 to a halfway house. Neither party provided proof of the actual offense.

Mother claimed that approximately one month after his 2012 release, Father violated the rules relating to his release and was sent back to "prison" for "a few more months." Father denied he was sent to back to "prison," but admitted he did not successfully complete his term at the halfway house and was sent to a regional jail for "failure to obey staff command." Father explained he spent forty days in jail and then returned to complete his sentence at the halfway house. He was released "on probation" in 2013.

Mother stated Father was incarcerated a second time for a drug offense involving heroin. In fact, at the time of the hearing, Father remained incarcerated in a South Carolina facility for that offense. Mother testified Father told her he was "pulled over while he was driving, that he was high on prescription pills . . . and they found heroin on him in his vehicle." Father admitted that after his 2013 release, his probation was revoked for possession of heroin. According to Father, the possession charge was dismissed, but it still constituted a violation of probation for which he was returned to confinement. He also denied the heroin was his, claiming it was simply in a car in which he was a passenger. Father admitted he will be incarcerated until February 20, 2015, at which time he will be sent to a halfway house for ninety days. Father produced documentation to support his release dates.

Mother stated that during his incarceration Father sent her a few e-mails, but he never tried to call and speak to J.M.H. Father claimed, however, he called J.M.H. even while incarcerated. Mother stated Father never sent letters to her inquiring about J.M.H. After he was first released to the halfway house, Mother stated that at her request he twice used Skype to speak to J.M.H.

However, she asked Father to call J.M.H. an "hour before her bed time so they could actually have phone conversations," but Father "didn't want to do that, so he just didn't call her." Father testified he spoke to J.M.H. every single day he was in the halfway house.

Given his criminal background, Mother worried J.M.H. would be in danger if she were ever in Father's custody. According to Mother, Father failed to provide any financial support for J.M.H. and given his incarceration, had limited, if any, contact with the child, and the contact he had was at her insistence. It is undisputed that Father always knew where J.M.H. was and how to contact her. In fact, after Mother filed her petition to terminate Father's parental rights, Father called her. Mother said she told him J.M.H. was at school and Father responded, "I know that. I want to talk to you." Father denied this, stating he specifically called to speak with his daughter, but admits Mother told him J.M.H. was at school. Mother testified she asked him why he was fighting the termination if he did not even want to communicate with his daughter; Father "didn't really have a good reason for it." She then asked him if he wanted to speak to J.M.H. and if so, he could call back after 4:00 p.m. However, Father never called back. Father did not recall Mother telling him to call back after 4:00 p.m. and explained he did not call back because he "didn't have any more money to call her back," which he explained to Mother before he hung up. Father testified he called back some time later, but there was no answer.

Mother testified he never sent letters, birthday cards, Christmas cards, or any gifts to the child. Father denied this. Father testified he sent his daughter a Disney pillow in 2011 and a Disney Princess Belle dress in 2012. He also claimed he sent J.M.H. clothes and toys. Father produced a single 2013 order receipt for an item from The Children's Place, which was allegedly sent to J.M.H. from Father. Mother testified she set up the account for The Children's Place at Father's request, but she stated she never received any items from the store for J.M.H. from Father. Mother stated Father claimed he was going to send his daughter some clothes, but none were ever

received. Father admitted that he was unable to provide financial support while he was incarcerated.

Mother testified that although Father refused any efforts by Mother to forge a relationship between Father and J.M.H., Father maintained a relationship with his son, who was born to another woman. Mother testified that at the time of the hearing, the boy was eight-years-old. According to Mother, during times when Father is not incarcerated, he spends time with his son. Father also "helps pay for his extracurricular sports and activities. He helps to provide for the child." Mother stated she knows this because Father told her and she has a relationship with the other child's mother. Father testified he has a "wonderful" relationship with his son and was in his life every day, except for the periods of incarceration. He would speak to his son on the telephone when he was incarcerated. Father testified he could not provide financial support for his son while he was in prison.

Mother stated it would be in J.M.H.'s best interests if Father's parental rights were terminated. She explained that given Father's absence from J.M.H.'s life due to incarceration and his lack of desire to establish a bond — despite her continual attempts to persuade Father to establish a relationship with his daughter — J.M.H. "doesn't know" Father and "he hasn't done anything to try to build that relationship. . . ." Mother testified she is concerned that if something happened to her and Father retained his parental rights, J.M.H. would be taken from the only family she has known — her stepfather and younger half-brother — "and given to a man that she doesn't know." Mother stated she married her current husband, M.H., in 2011 when J.M.H. was two-years-old and that J.M.H. has bonded with him, calling him "dad." According to Mother, in J.M.H.'s eyes, M.H. is her father. Mother and M.H. have a child who was three-years-old at the time of the hearing. Mother testified her marriage is "very good," and "very happy."

Father testified he did not want the court to terminate his parental rights. He stated that if he did not want a relationship with his daughter, he would not go through the proceedings to retain his rights. Father stated that once he is released, he plans to obtain a commercial driver's license and had already applied to a driving school and has been accepted. He testified he is taking business classes, a class regarding the commercial driver's license, as well as an HVAC class. Father advised he intends to provide for J.M.H. "like I was doing before when we were together."

### *Application*

After considering the evidence, the relevant *Holley* factors, and the applicable standards of review, we hold there is legally and factually sufficient evidence to support the trial court's determination that termination of Father's parental rights was in J.M.H.'s best interests. The evidence, as detailed above, essentially presented the trial court with a "he said — she said" scenario with regard to contact, financial support, Father's drug use, and the details of Father's criminal history.

In essence, Mother testified that once she told Father she was pregnant, he abandoned her and thereafter failed to maintain contact with child or provide financial support for the child. Father's testimony was completely to the contrary. He stated that prior to Mother's move to England, they lived together and raised J.M.H. together. Father testified he saw her nearly every day and contributed to the household bills and to items specifically for the child. Moreover, he claimed that even after Mother went to England, but for his periods of incarceration, he continued to provide financial support and maintained contact with his daughter — speaking to her almost daily and sending cards and gifts, claims disputed by Mother.

Given the "he said — she said" nature of the evidence, we conclude the issue was one of credibility, which depends on appearance and demeanor, and therefore is within the province of the trial court in this case. The trial court clearly found Mother's testimony more credible, a

determination that is not unreasonable given Father's criminal record, and we must therefore defer to trial court. *See J.P.B.*, 180 S.W.3d at 573. Moreover, we must resolve disputed facts in favor of the trial court's finding that termination was in the child's best interests because a reasonable fact finder could have so resolved them. *See id.*

As to Father's criminal background, it is undisputed that Father has spent the majority of J.M.H.'s life behind bars or in a halfway house. The only dispute is the seriousness of his offenses. According to Mother, he was sent to prison for four years because he pointed a gun, a deadly weapon, at a police officer. Father claims he was merely in possession of a firearm, a crime because he had a prior felony conviction. As for the heroin possession, Father claimed the drugs did not belong to him, but Mother testified he told her he was high on prescription drugs and was pulled over — during the stop, law enforcement officials found he was in possession of heroin. What is undisputed is that this event resulted in a revocation of his probation and he will not be fully released from custody until May 2015.

It is accepted law in this state that a court may consider a parent's unstable lifestyle in determining the best interests of a child. *In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.). Moreover, drug use and incarceration may be considered in a best interests analysis. *See In re N.L.D.*, 412 S.W.3d 810, 819 (Tex. App.—Texarkana 2013, no pet.) (citing *In re M.R.*, 243 S.W.3d 807, 820 (Tex. App.—Fort Worth 2007, no pet.). The absence of a home may also be considered. *In re J.D.*, 436 S.W.3d 105, 119 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Clearly, the evidence demonstrates the total instability of Father's life since 2009 — two incarcerations, current confinement, and the complete absence of a home.

Additionally, it is undisputed that J.M.H. has bonded with her stepfather and has a stable, loving home with Mother. J.M.H. refers to M.H. as "dad" and thinks of him as her father. She also has a half-brother. Since the age of two, this is the only home J.M.H. has known. Even if

Father is released from custody in 2015, he has no firm prospects for work or home. There is little, if any, evidence regarding Father's parental abilities. He has not spent time with J.M.H. since his incarceration in 2009 — more than five years. He states he intends to obtain a commercial driver's license, but his ability to do so is questionable given his criminal past. The evidence concerning his future job prospects is speculative. He clearly has no home of his own — in the past, when not living with Mother, it appears he stayed with his mother and grandmother.

Finally, Father raises an issue contesting the grounds upon which the trial court based the termination. Although he denied abandoning Mother and J.M.H. and claimed to have supported them, these are grounds upon which his parental rights were terminated. *See* TEX. FAM. CODE ANN. § 161.001(1)(F), (H). In addition, he does not dispute that he knowingly engaged in criminal conduct that resulted in a conviction and imprisonment and an inability to care for J.M.H. for more than two years from the date Mother filed her petition. *Id.* § 161.001(1)(Q). As we stated above, although proof of acts or omissions under section 161.001(1) of the Family Code does not relieve the Department from proving the best interests of the child, the same evidence may be probative of both issues. *See C.H.*, 89 S.W.3d at 28.

In conclusion, we hold that under the clear and convincing standard, the evidence is such that the trial court could reasonably have formed a firm belief or conviction that termination was in J.M.H.'s best interests. *See J.P.B.*, 180 S.W.3d at 573. We therefore overrule Father's sole issue.

### *Conclusion*

Accordingly, based on the foregoing, we affirm the trial court's judgment.

Marialyn Barnard, Justice